629 So.2d 1387 (1993)
STATE of Louisiana
v.
Arthur James JOURNET.
No. CR 93-764.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1993.
*1388 Michael Harson, Lafayette, for the State.
G. Paul Marx, Lafayette, for Arthur James Journet.
Before LABORDE, COOKS and DECUIR, JJ.
COOKS, Judge.
Arthur James Journet, by grand jury indictment, was charged with the crime of second degree murder for fatally wounding Stefan Boudreaux, in violation of La.R.S. 14:30.1. Journet, only sixteen (16) years of age at the time of the offense, was tried as an adult following adjudication pursuant to the Louisiana Children Code article 305. He was found guilty as charged by jury verdict and sentenced to serve a mandatory life imprisonment term at hard labor without the benefit of probation, parole, or suspension of sentence. He appeals the conviction and sentence assigning the following errors for our review:
"I. [His] motion for post verdict judgment of acquittal should have been granted because the defendant established intoxication and provocation sufficiently to defeat the murder indictment in favor of a verdict of manslaughter.
II. The poll of the jury was not proper, the foreperson never confirmed the verdict, and therefore the record presents patent reversible error."
After carefully examining the record, we find the assignments are without merit.

FACTS
On the night of July 11, 1992, a group of young men gathered in the vicinity of Cast's Liquor Store located at the intersection of Simcoe and St. Antoine Street in the City of Lafayette. This was not an unusual happening. Leedrick Senigal, then eighteen (18) years of age, rode his bicycle to Cast's Liquor Store to purchase food and drinks. On arrival, he noticed Sidney Anderson standing nearby. In the past, Anderson and Senigal had exchanged "harsh words" regarding a female acquaintance. Anderson also noticed Senigal. Quickly, Anderson crossed the street pointing out Senigal to the group of men still standing and conversing nearby.
Arthur Journet, accompanied by other members of the group, approached the store's entrance. Senigal did not have any prior contact with Journet who was not at all familiar to him. As Senigal exited the doorway, he was struck immediately by Journet. Several young men joined in the resulting fistic confrontation before the store manager gained control of the scene by instructing Journet and his friends to leave the premises. The manager also escorted Senigal to safety inside the store. By all accounts, the witnesses expressed they believed the altercation had ended and the parties were disbanding peacefully. Calmly, Journet crossed the street in the direction of a parked bicycle which he mounted briefly. Instead of peddling the bike away from the scene, however, he removed from it a brown paper bag which contained a loaded Arminius Titan Tiger .38 *1389 special caliber revolver. Armed, Journet once again proceeded in the direction of Cast's Liquor Store where young Senigal waited inside protected by the store manager. Stefan Boudreaux, an innocent bystander, without ill-will and obviously with deep concern simply said to Journet "you ought to cut that out before you get yourself in some trouble or go to jail." Still calm in expression and calculated in demeanor, Journet turned and fired at close range (without interruption) six (6) bullets in the body of the innocent bystander. As the victim [fatally wounded] hollered for help, Journet walked away, mounted his bicycle, and left the scene. Later, police officers were advised that Journet, accompanied by his mother, was located at the True Vine Ministries Church and wished to voluntarily surrender to the authorities. In his mother's presence and after being fully advised of his constitutional rights, Journet led the officers to a gun which he hid in a clothes dryer vent extending from a unit at the Delahoussay Street Housing Project. The weapon was identified, by scientific testing, as the Titan .38 caliber revolver used to fire the bullets recovered from the victim's body.

ASSIGNMENT OF ERROR NUMBER 1
Defendant's first assignment of error questions the sufficiency of the evidence presented by the State to support the second degree murder verdict returned by the jury. Specifically, defendant urges the evidence he introduced to show intoxication and provocation weakened the strength of the State's evidence presented to show he possessed a "specific intent" to kill the victim below the "sufficiency level" required to convict him of second degree murder. He argues the evidence as a whole was only sufficient to convict him of the lesser included offense of manslaughter.
Our review of this assignment of error is limited to determining whether or not, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the State proved the elements of the crime of second degree murder beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981).
To obtain a second degree murder conviction, the State was required to show (beyond a reasonable doubt) that Journet shot and wounded Stefan Boudreaux with the specific intent to kill him or to inflict great bodily harm. Specific intent is defined further in LSA-R.S. 14:10(1) as:
"... that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."
Defendant does not dispute he shot and killed Stefan Boudreaux. Rather, defendant contends his alleged self induced intoxication, caused by drug use and alcohol consumption, rendered him mentally incapable of forming the requisite specific intent to kill Stefan Boudreaux. Ordinarily, a defendant's intoxicated or drugged condition at the time of an offense is immaterial except "where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific knowledge required in a particular crime." LSA-R.S. 14:15(2). Thus, voluntary intoxication may operate on limited occasions as an affirmative defense to a second degree murder charge. The burden, however, is upon the defendant to prove the existence of an intoxicated or drugged condition sufficient to negate the State's evidence establishing the requisite specific intent. State v. Tezeno, 507 So.2d 291 (La. App. 3d Cir.1987).
Four and one-half (4-½) hours after the shooting, defendant's blood alcohol concentration was .01 percent. Mr. David Epstein, a forensic chemist using an average alcohol metabolic rate, testified defendant's BAC at the time of the offense ranged between .06 and 0.8 percent. Under certain circumstances, proving a person had a BAC of .10 percent is "presumptive" evidence of legal intoxication. However, defendant's level of intoxication was less than this statutory minimum. Dr. Harper, a neurologist and psychopharmacologist, testified defendant's level of *1390 alcohol concentration would not have prevented him necessarily from forming the specific intent to kill.
Countering this evidence, defendant called several witnesses who testified they saw him drink two (2) beers and smoke a marijuana joint on the night of the incident. Merely showing that he consumed alcohol prior to committing the offense is not sufficient alone to negate the State's showing of specific intent. State v. Corley, 617 So.2d 1292, 12307 (La.App. 3d Cir.1993); State v. Tezeno, supra; State v. Maxey, 527 So.2d 551 (La.App. 3d Cir.1988), writ denied, 541 So.2d 868 (La.1989); State v. Salas-Martinez, 524 So.2d 871 (La.App. 3d Cir.), writ denied, 525 So.2d 1047 (La.1988). Defendant fired six (6) bullets into Stefan Boudreaux's body with a high powered revolver. The experts testified defendant's blood alcohol concentration would not preclude him from specifically intending to kill the victim or inflicting great bodily harm on his person. Following the shooting, defendant fled the scene riding a bicycle and without apparent difficulty and possessing enough mental presence to hide the murder weapon. The jury reasonably could have concluded from the evidence as a whole, that defendant's mental state was not sufficiently diminished to render him incapable of forming the required intent to kill Mr. Boudreaux or inflict great bodily harm on his person.
Likewise, we find defendant's provocation defense insufficient to merit reversal of the jury's verdict. While he attempts to shift the burden of proving the "absence of provocation" to the State by assigning it as an element of the offense of second degree murder, it is well settled that the burden of establishing the defense of provocation rests with the defendant. State v. Green, 588 So.2d 757 (La.App. 4th Cir.1991). To reduce second degree murder to manslaughter, defendant must present evidence to show by a preponderance that the homicide was committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. State v. Lee, 498 So.2d 1177 (La.App. 3d Cir.), writ denied, 504 So.2d 874 (La.1986). "Sudden passion" and "heat of blood" are not elements of the crime of manslaughter. They are factors which mitigate against finding a defendant as culpable as a person who commits a homicide without the occurrence of any extenuating event. State v. Lombard, 486 So.2d 106 (La. 1986).
Defendant apparently argues the fight he initiated and provoked with Senigal somehow caused him to later act with "sudden passion" and "heated blood" in shooting an innocent bystander. According to the record evidence, defendant approached a stranger and struck him, without any reason, except perhaps he argued with his friend earlier. Within minutes thereafter, he retrieved a loaded revolver and blasted six (6) holes in the body of another stranger whose only fault was caring enough to warn him that "no good" would come from his persistent conduct. Defendant simply failed to present any evidence of provocation which preponderated in favor of lessening the consequences of his heinous crime.

ASSIGNMENT OF ERROR NUMBER 2
After reading the jury verdict aloud, the trial judge orally noted that ten (10) slips with the question asked, "Is this your verdict?," were checked "Yes" by the jurors and two (2) were checked "No" by them. Defendant complains the jury should have been polled by requiring that the members orally indicate whether the verdict accurately reflected their vote. Defendant's contention is without merit. The procedure employed by the trial judge complied with the statutory requirements of article 812 which permits written polling of the jury. Moreover, defendant failed to contemporaneously object to the trial court's method of polling the jury. Therefore, we are prevented from reviewing this assignment which seeks to raise the alleged error for the first time on appeal. State v. Lamb, 458 So.2d 996, 999 (La.App. 3d Cir.1984).

ERROR PATENT
Louisiana Code of Criminal Procedure article 930.8 provides at the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post-conviction relief.
*1391 The record shows the court did not inform defendant of this delay period. The defect does not bear on whether the conviction is proper. Thus, it is not grounds to reverse the sentence or remand the case for resentencing. Louisiana Code of Criminal Procedure article 921. The three year prescriptive period does not begin to run until the judgment is final under Louisiana Code of Criminal Procedure articles 914 and 922. The district court is directed to inform defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten (10) days of the rendition of this opinion and to file written proof that the defendant received the notice. State v. Fontenot, 616 So.2d 1353 (La.App. 3d Cir. 1993).
AFFIRMED WITH INSTRUCTIONS.